```
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
   UNITED STATES OF AMERICA                        :

            v.                                     :

   HECTOR ROSARIO,                                 :
                                                        22 CR 355 (ENV)
                         Defendant.                :
------------------------------------------------------------------x
```

# MEMORANDUM OF LAW IN SUPPORT OF HECTOR ROSARIO'S MOTION FOR A JUDGMENT OF ACQUITTAL

**LOUIS M. FREEMAN**
Freeman, Nooter & Ginsberg
75 Maiden Lane, Suite 907
New York, NY 10038
(212) 608-0808

Nadjia Limani, Associate Counsel
Kestine Thiele, Mentee

*Attorneys for Hector Rosario*

TO:    JOHN DURHAM, Esq.
       United States Attorney
       Eastern District of New York
       271 Cadman Plaza East
       Brooklyn, New York 11201
       Attn:   AUSA Anna Karamigios
               AUSA Sophia Suarez
               AUSA Sean Sherman

# PRELIMINARY STATEMENT

Hector Rosario was charged with one count of obstruction of justice (Count Seven), in violation of 18 U.S.C. 1512(c)(2), and one count of false statements (Count Eight), in violation of 18 U.S.C. 1001(a)(2), in a multi-count, multi-defendant indictment dated August 4, 2022.

On March 5, 2025, a jury found Mr. Rosario not guilty of Count Seven and guilty of Count Eight (Counts One and Two of the trial indictment, respectively); and on the same day, the Court set a post-trial motion schedule, with defense motions due by April 7, 2025, government response by May 12, 2025, and defense reply, if any, by May 19, 2025.

Mr. Rosario moves the Court to enter an Order for a judgment of acquittal on Count Eight pursuant to Rule 29 of the Federal Rules of Criminal Procedure. As the following paragraphs will show, the motion must be granted.

# STATEMENT OF FACTS

On January 27, 2020, Mr. Rosario made statements to Special Agents of the Federal Bureau of Investigation ("FBI") during an interview which took place just outside of his residence in the hallway of his apartment building. During the interview, Mr. Rosario denied knowledge of both: (1) an individual named Damiano Zummo and (2) a gambling operation named "Sal's Shoe Repair" at 41 Merrick Avenue, Merrick, New York.

**A. Government Case**

The government's evidence was comprised of:

1. Testimony of cooperating witness Damiano Zummo;
2. Testimony of cooperating witness Salvatore Russo;
3. Testimony of New York Police Department ("NYPD") Detective Brian Hilt;

4. Testimony of Nassau County Police Department ("NCPD") Detective John Clinton;

5. Testimony of FBI Agent Orlando Tactuk;

6. Testimony of cooperating witness Salvatore Rubino; and

7. Testimony of FBI Agent Jarryd Butler.

The government entered into evidence photographs and video, audio recordings, and various documents. *See* Gov't Exhibits GX 1-23, 50-92, 100-107, 120-124, 130, 133, 137-140, 201-205, S-A (stipulation by both parties as to authenticity of nine audio recordings).

**B. Defense Case**

Mr. Rosario did not put on a defense case.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29(a) requires a court to "enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." "The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). Thus, the Court must determine, after "considering all of the evidence, direct and circumstantial, that 'no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Eppolito*, 534 F.3d 25, 45 (2d Cir. 2008) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)). The Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States*

*v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)). A jury's guilty verdict may be sustained only "if there is substantial evidence" to support it, *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991) (emphasis in original) (citations omitted), and a "mere modicum" will not do. *Jackson*, 443 U.S. at 320.

Although it is generally left to the jury to determine the credibility of witnesses, weigh the evidence, and draw justifiable inferences from proven facts, *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1971), "juries do not have carte blanche," *United States v. Blasini-Lluberas*, 169 F.3d 57, 62 (1st Cir. 1999), and "[t]he jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy," *Taylor*, 464 F.2d at 243. Accordingly, on a Rule 29 motion, the Court is required to "take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *Blasini-Lluberas*, 169 F.3d at 62 (internal citations and quotation marks omitted); *see also United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) ("specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty" (internal citation, quotation marks, and alterations omitted)).

In making a sufficiency determination, the Court is "obligated to 'consider the evidence presented at trial in its totality, not in isolation.'" *United States v. Kapelioujnyj*, 547 F.3d 149, 154 (2d Cir. 2008) (quoting *United States v. Zhou*, 428 F.3d 361, 369-70 (2d Cir. 2005)). "If the evidence is such that reasonable jurors must necessarily have ... a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Taylor*, 464 F.2d at 243. Moreover, if the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must

necessarily entertain a reasonable doubt." *Coplan*, 703 F.3d at 69. In other words, where the evidence is "in equipoise," a judgment of acquittal is required. *Id.*; *see also United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002); *United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994).

## ARGUMENT

The verdict on Count Eight (Count Two of the Trial Indictment) must be set aside because it was not supported by substantial evidence of Mr. Rosario's guilt beyond a reasonable doubt. To carry its burden of proving beyond a reasonable doubt that Mr. Rosario is guilty of Count Eight, false statements, in violation of 18 U.S.C. § 1001(a)(2) the government was required to prove:

> First, that on or about the date specified, the defendant made a statement or representation;
>
> Second, that this statement or representation was material;
>
> Third, the statement or representation was false, fictitious or fraudulent;
>
> Fourth, the false, fictitious or fraudulent statement was made knowingly and willfully; AND
>
> Fifth, the statement or representation was made in a matter within the jurisdiction of the government of the United States.

The central issue here is the element of materiality. The evidence presented at trial was insufficient to support a finding of guilt beyond of a reasonable doubt on Count Eight because the government failed to prove that Mr. Rosario made any false statement or representation that was "material," within the meaning of Section 1001.

### A. Relevant Law

Section 1001 was designed "to protect authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Shanks*, 608 F.2d 73, 75 (2d Cir. 1979) (quoting *United States v. Gilliland*, 312

U.S. 86, 93 (1941). The statute is viewed as seeking to protect both the operation and the integrity of the government. *United States v. Rogers*, 466 U.S. 475, 479 (1984). In *United States v. Adler*, this Court held that FBI investigations were "matter(s) within the jurisdiction of any department or agency of the United States" for purposes of § 1001 and that "(t)he making of intentionally false statements to the FBI calculated to provoke an investigation by that agency" violated the statute. 380 F.2d 917, 922 (2d Cir. 1967).

Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) "what statement was made?" and (b) "what decision was the agency trying to make?" The ultimate question: (c) "whether the statement was material to the decision," requires applying the legal standard of materiality to these historical facts. *United States v. Gaudin*, 515 U.S. 506, 512 (1995). "Courts have 'broadly construed' materiality." *United States v. Regan*, 103 F.3d 1072, 1084 (2d Cir. 1997) (citing *United States v. Gribben*, 984 F.2d 47, 51 (1993). "A finding of materiality does not require proof of 'actual reliance.'" *United States v. Litvak*, 889 F.3d 56, 65 (2d Cir. 2018) (citing *United States v. Vilar*, 729 F.3d 62, 89 (2d Cir. 2013)). "Rather, 'the test is the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end.'" *United States v. Brettschneider*, 832 F. Appx. 14, 16 (2d Cir. 2020) (citing *United States v. Serv. Deli Inc.*, 151 F.3d 938, 941 (9th Cir. 1998)).

Materiality must be judged by the facts and circumstances of a particular case. *Weinstock v. United States*, 231 F.2d 699, 702 (1956). When used in respect to evidence, "material" is often confused with "relevant," but the two terms have wholly different meanings. To be "relevant" means to relate to the issue. To be "material" means to have probative weight, i.e., reasonably likely to influence the agency in making a determination required to be made. *Id.* at 701. The

issue to which the false statement is material may not be the main issue; it may be a collateral issue. *Id.* at 703. However, it must have some weight in the process of reaching a decision. *Id.* For example, a passport applicant's false statements as to name, identity and citizenship were material to the U.S. State Department's decision as to whether to grant a passport. *United States v. Ramos*, 725 F.2d 1322 (11 Cir. 1984). It is not in dispute that a false statement need not actually influence a government function; indeed, it is whether such a false statement had the capacity to influence or distract government investigators' attention away from a critical matter. *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012); *see United States v. Stewart*, 433 F.3d 273 318 (2d Cir. 2006).

### B. Mr. Rosario Did Not Make Any "Materially" False Statement During His January 27, 2020 Interview with the FBI

The government's evidence at trial was insufficient to support a necessary element of the crime of false statements—materiality. The question of materiality requires analysis of the facts and circumstances of each particular case. *Weinstock*, 231 F.2d at 702. The test is not one-size-fits-all. Here, the indictment charged two false statements: that (a) Mr. Rosario did not know the identity of John Doe (now known to be cooperating witness Damiano Zummo) and (b) Mr. Rosario was not familiar with the gambling business known as "Sal's Shoe Repair" located in and around 41 Merrick Avenue, Merrick, New York. The facts and circumstances of this case demonstrate that Mr. Rosario's statements to the FBI, regarding his knowledge of Zummo's identity and Sal's Shoe Repair, did not have the capacity to influence the FBI or distract its investigators away from a critical matter. To the contrary, the government's evidence supports the fact that the FBI agents engaged in this "field interview" of Mr. Rosario, not to further their investigation, but to obtain admissions of guilt.

FBI Agent Orlando Tactuk, who participated in the January 27, 2020 interview of Mr. Rosario at his residence, testified that he asked Mr. Rosario if he could either identify Damiano Zummo by photograph or by name, and Mr. Rosario responded he could not. Tr. 490: 7-22. Agent Tactuk also testified that he asked Mr. Rosario if he was aware of Sal's Shoe Repair or the address 41 Merrick Avenue in Merrick, New York and that Mr. Rosario responded he was not. Tr. 470-71: 15-25, 1. Neither of these statements were material under the law.

Agent Tactuk's pointed questions indicate that the FBI's had one objective—to get Mr. Rosario to incriminate himself, either through admissions of guilt or making false statements. This is entirely at odds with Agent Tactuk's testimony that the purpose of Mr. Rosario's interview was "to identify other members of organized crime that were operating in Nassau County as well as other illegal gambling operations in the area" and "to potentially identify other members of the Nassau County Police Department or law enforcement that were corrupt." Tr. 463-64: 19-25, 1-4. This simply feigns legitimacy. The answer to every question by the FBI was long known to the agency: the nature and origin of his relationship with Salvatore Russo, Russo's illegal and legal businesses, familiarity with illegal gambling locations, the identities of crime family associates involved in illegal gambling, Mr. Rosario's investigations, if any, into illegal gambling while at NCPD, and the marijuana grow house. *See* Tr. 447-91.

Agent Tactuk did not establish any meaningful inquiry into known or unknown organized crime members operating illegal gambling locations. His testimony shows no attempt to gather new information about others' criminal activity, nor does it show attempt to identify other members of NCPD or law enforcement that were corrupt. The interview did not include a *single* question about other law enforcement officers engaging in corrupt activity. Most notably, because the FBI had existing relationships with cooperating witnesses Zummo and Russo at the

8

time of the interview, Mr. Rosario's accused false statements about Zummo's identity and Sal's Shoe Repair did *not* have the capacity to influence the FBI. In fact, the opportunity for the FBI to probe into these issues with Mr. Rosario was born from the information the FBI gathered from the two cooperators. It follows that the Agent Tactuk and the FBI's true intention in interviewing Mr. Rosario was to elicit either admissions of guilt or false statements.

This assertion is further supported by the fact that Agent Tactuk came to the interview equipped with two incriminating audio recordings of Mr. Rosario and Russo and a NCPD police report detailing a tip Mr. Rosario provided to Detective Clinton about a gambling location, specifically to rebut Mr. Rosario's anticipated false statements. *See* Tr. 483: 13-17; 477: 8-20.

After Zummo and Russo were arrested in November 2017, on an unrelated federal narcotics trafficking case, they began cooperating with the government. Tr. 457. As part of his proactive cooperation, Russo started making consensual recordings. Tr: 461: 11-19. He made recordings as an FBI source, with the FBI's guidance, between 2017 and 2023. Tr. 462: 5-7; *see* Tr. 498: 11-16; 499: 2-16. These recordings included phone calls and in-person meetings with Mr. Rosario. Tr. 461-62: 15-25, 1-4. As part of Russo's historical and proactive cooperation, he provided the FBI with information on numerous members of organized crime operating in Long Island and elsewhere, including but not limited to Zummo, Carmine Polito, Damiano Coraci, Salvatore Rubino, illegal gambling clubs operated by these individuals, as well as information about David Locket, Mr. Rosario, a marijuana grow house and any law enforcement officers who were involved in shutting down or attempting to shut down illegal gambling locations. *See* Tr. 459-61. Zummo, a made member of the Bonanno crime family, shared similar information with the FBI during his historical cooperation. Tr. 54: 4-19; *see generally* Tr. 47-124. Namely, he told the FBI that Mr. Rosario had previously gone to Zummo's residence with Russo to inform him

9

that he was the subject of a criminal investigation, and that Mr. Rosario conducted a fake raid on Sal's Shoe Repair at his and Russo's direction. Tr. 461: 2-7; 99: 4-15; 101: 24-25; *see also* Tr. 111-12: 9-25, 1-14.

The trial record clearly establishes that through Zummo and Russo's federal cooperation, the FBI, at the time it interviewed Mr. Rosario on January 27, 2020, knew the information they were purportedly trying to gather from Mr. Rosario. Turning to the two charged false statements, the FBI knew from both cooperators' historical information that Mr. Rosario had previously met Zummo in-person at Zummo's residence. It also knew through Russo's proactive cooperation that Mr. Rosario had previously met and knew Zummo's identity because one of Russo's consensual recordings captured Russo directly asking Mr. Rosario if he remembered Zummo and going to his residence and Mr. Rosario responding in the affirmative. *See* Tr. 266-68. Through Zummo and Russo's historical cooperation, the FBI also knew that Mr. Rosario had previously conducted a fake raid on Sal's Shoe Repair. Through Russo's proactive cooperation, the FBI received what they certainly believed to be confirmation of that through a consensual recording where Russo asks Mr. Rosario if he remembered when Mr. Rosario "went [] to the shoemaker that time." Tr. 268: 17-23. Both Zummo and Russo armed the FBI with knowledge that allowed Agent Tactuk not only to ask Mr. Rosario pointed questions in January 2020, but also to know which answers were truthful, regardless of Mr. Rosario's responses.

The test of materiality requires consideration of two subsidiary questions: what statement was made and what decision was the agency trying to make. It also requires consideration of the ultimate question: whether the statement was material to the decision. *Gaudin*, 515 U.S. at 512. In this case, with respect to the two charged false statements, there is little doubt as to what statements Mr. Rosario made. However, the only decision the FBI could have been making in

accepting those statements was whether to inform prosecutors of its suspicions that Mr. Rosario made false statements. Mr. Rosario's denials did not affect the FBI's "Double Jackpot" investigation, nor did they have the capacity to do so. Tr. 459-60: 25, 1. The facts show that the FBI did not at all intend to gather information to further its investigation. Though Mr. Rosario's knowledge of Russo's marijuana grow house was not a false statement charged in the indictment, Agent Tactuk's brief inquiry into the topic sheds light on his larger strategy with Mr. Rosario that January 2020 morning. Agent Tactuk asked if Mr. Rosario was aware of Russo having a marijuana grow house in Queens, and when Mr. Rosario denied awareness, Agent Tactuk told Mr. Rosario that he was observed there. Tr. 482: 5-8. Agent Tactuk asked Mr. Rosario that question despite explicitly asking his proactive cooperator Russo to bring Mr. Rosario to the grow house and ask for his assistance in moving marijuana and knowing that Mr. Rosario declined. Tr. 499: 7-16. It belies the intent behind Section 1001 to find Mr. Rosario's statements "material," when the FBI's contents and method of inquiry make plain its sole objective to either obtain admissions of guilt or false statements from Mr. Rosario.

The only possible effect of exculpatory denials, however false, received from a suspect is to stimulate the agent to carry out his function. *United States v. Philippe*, 173 F. Supp. 582, 584 (S.D.N.Y. 1959). It would be strange to expect that an agent would accept a defendant's denials and conclude that his investigation should be closed. *Id.* Manifestly, refusal of a suspect to affirmatively assist a criminal investigator in preparing a case for criminal prosecution against himself has no tendency to pervert the investigator's function. *Id.* The perverting potential of any false statement by Mr. Rosario is not obvious here. Mr. Rosario's conduct is distinguishable from that of the average case involving a violation of Section 1001. Certainly, that in and of itself, does not make him ineligible for prosecution under the statute. However, after careful

examination of the facts and circumstances in this case, none of Mr. Rosario's denials furnished a foundation for further inquiry and computation, nor did they have the capacity to send the government down wrong paths and blind alleys.

A number of courts have suggested that Section 1001 prosecutions like that of Mr. Rosario's either fail to comport with the requirements of the Fifth Amendment,[1] encourage improper law enforcement procedures,[2] and over-criminalize insubstantial or technical violations of the statute.[3]

In *United States v. Cowden*, when the defendant arrived into the United States, he indicated on his customs form that he was not carrying over $ 5,000 in currency. 677 F.2d 417 (8th Cir. 1982). Upon further questioning and a cursory search of the defendant's bag, a customs agent asked if the defendant wanted to change his answer. *Id.* He indicated that he did, yet the customs agent did not permit him to do so. *Id.* The defendant was convicted of false statements, under 18 U.S.C. § 1001. *Id.* On appeal, the court reversed the defendant's conviction, "conclud[ing] that the government's conduct contributed to the ultimate existence of a material false statement." *Id.* at 421.

In *United States v. Stoffey*, the Seventh Circuit reversed a conviction of false statements where the defendant's allegedly false answers to questions posed to him by federal officers, would have been confessions of guilt and where the purpose of the agents was not to obtain information, but to obtain admissions. 279 F.2d 924, 927 (7th Cir. 1960). The Court reasoned

---

[1] *See, e.g.*, United States v. Bush, 503 F.2d 813, 818 (5th Cir. 1974); *United States v. Lambert*, 501 F.2d 943, 946 n.4 (5th Cir. 1974) (en banc); *United States v. Davey*, 155 F. Supp. 175, 178 (S.D.N.Y. 1957).

[2] *See United States v. Cowden*, 677 F.2d 417, 420-21 (8th Cir. 1982); *United States v. Bush*, 503 F.2d 813, 815-16 (5th Cir. 1974); *United States v. Stoffey*, 279 F.2d 924, 927 (7th Cir. 1960); *United States v. Gomez-Londono*, 422 F. Supp. 519, 525-26 (E.D.N.Y. 1976), *rev'd on other grounds*, 553 F.2d 805 (2d Cir. 1977) (finding that a Customs inspection should be conducted so that the probable result is compliance with the law, not the eliciting of a violation of the law).

[3] *See Friedman v. United States*, 374 F.2d 363, 367 (8th Cir. 1967); *Paternostro v. United States*, 311 F.2d 298, 303 (5th Cir. 1962); *see United States v. Levin*, 133 F. Supp. 88, 90 (D. Colo. 1953).

that the federal officers had already reached their relevant decision (in that case, an arrest) at the time they interviewed the defendant, and acted accordingly. *Id.* Those officers knew they would not be diverted from their course by alleged false statements of the defendant, and therefore, the statements did not have the capacity to influence them.

Implicit in the reasoning of the courts that have restricted the scope of the statute is that answers known to be false in an investigatory situation cannot be material. If an investigator suspects the declarant of criminal activity, or even further, as in this case, knows the declarant to have been involved in criminal activity as a result of lengthy relationships with cooperators, he also expects the declarant to lie. He will not and cannot be misled by falsehood.

The Department of Justice's Criminal Resource Manual states: "Materiality is best shown by the testimony of a witness, generally those who make the decisions on the application or statements in the particular case, concerning the influence that defendant's allegedly false statement might have had on the ultimate result of the transaction. Such a witness may be an expert witness or a fact witness, or both."[4] Such evidence did not exist here. Agent Tactuk did not testify about Mr. Rosario's false statements affecting or having the ability at the time to affect the FBI's investigation. Instead, Agent Tactuk's testimony highlighted the FBI's rather narrow probe into specific acts and relationships of Mr. Rosario, all of which the FBI had knowledge of and corroboration for. Consequently, Mr. Rosario's false statements were not "material."

The FBI's conduct in eliciting the false statements from Mr. Rosario was fundamentally unfair. It is evident that the agents to whom Mr. Rosario made statements were improperly

---

[4] "CRM 500-999: 911. Materiality," *Criminal Resource Manual*, Dep't. of Justice, *available at* https://www.justice.gov/archives/jm/criminal-resource-manual-911-materiality.

13

seeking admissions of guilt, not information to guide or further their investigation. The FBI created the circumstances that gave rise to the existence of Mr. Rosario's statements.

Although the jury is left to evaluate witness credibility, weigh the evidence, and draw justifiable inferences, it does not have "carte blanche." *Blasini-Lluberas*, 169 F.3d at 62. There is a point at which the Court, pursuant to Rule 29, must act as a safeguard against convictions based not on sufficient evidence, but only a "mere modicum" of evidence. *Jackson*, 443 U.S. at 320. Here, the government failed to present sufficient evidence to support Mr. Rosario's guilt of false statements because the record is absent of substantiation for the critical element of the crime—materiality.

Viewing the evidence in its totality and drawing all reasonable inferences in favor of the government, the evidence at trial was nevertheless insufficient to allow any rational juror to find beyond a reasonable doubt that Mr. Rosario was guilty of false statements.

## CONCLUSION

For the foregoing reasons, Mr. Rosario requests the Court to grant his Motion, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and enter a judgment of acquittal on Count Eight.

Dated:     April 7, 2025
              New York, New York

                                        Respectfully Submitted,

                                        /s/ Louis M. Freeman
                                        Louis M. Freeman
                                        Kestine Thiele
                                        Nadjia Limani